JOSEPH MESSNER, Plaintiff in error, *v.* THE PEOPLE, Defendant in error.

Upon the return of a writ of error to the Oyer and Terminer, the Supreme Court has no power to order the cause to be heard on the reporter's minutes taken upon the trial against the objections of the prisoner, although no bill of exceptions had been made or returned. (GROVER, J.)

Upon the trial of the prisoner for the murder of his wife, a witness for the people, who had heard cries proceeding from the house of the prisoner in the night preceding her death, was permitted to testify what these cries indicated, whether the person was crying from joy or grief.— *Held* error, and that the question called for the conjecture of the witness as to the cause of the cries, and not for a description of them. (PECKHAM and ALLEN, JJ., *contra*)

Statements made by the deceased shortly preceding her death, in the absence of the prisoner, are not admissible in evidence against him.

Where the record failed to show that the prisoner was asked by the court, after the verdict was rendered and before judgment was pronounced thereon, what he had to say why judgment should not be pronounced against him, or that any opportunity was given him by the court at this stage of the proceedings for that purpose.—*Held*, that this omission was error, for which there must be a new trial. (PECKHAM and ALLEN, JJ., *contra*.)

(Decided February 7, 1871.)

WRIT of error from the judgment of the General Term of the Supreme Court in the seventh judical district, affirming the conviction of the prisoner at the Monroe county Oyer and Terminer.

The defendant was indicted at the October term, in 1868, of the Oyer and Terminer in Monroe county, for the murder of his wife. He was tried at the April term, 1869, and convicted and sentenced to be hanged on the 4th of June, 1869. On the 16th of June a writ of error was allowed to the Oyer and Terminer and a stay of execution granted.

No bill of exceptions having been signed or sealed as provided by the statute, the district attorney, at a General Term of the Supreme Court, moved that court that the argument for a new trial be heard upon the reporters' minutes taken on the trial. The counsel for the prisoner opposed the motion, but it was granted. The case was argued and the judgment of the Oyer and Terminer affirmed, and at the term of the Oyer and Terminer, held October 22d, the prisoner was again sentenced to be hanged, December 10, 1869. December 9, 1869, a writ of error with stay of execution was granted by Judge Grover. Evidence to the introduction of which defendant objected, is sufficiently stated in the opinion of the court.

*M. B. Champlain*, attorney-general, for the people.

*George E. Ripsom*, attorney for plaintiff in error, with *W. H. Cheseboro* and *L. B. Proctor* of counsel, insisted that the record must show that defendant was in court and asked by the judge presiding what he had to say why judgment should not be pronounced against him. (*Rex.* v. *Geary*, 2 Salk., 630 ; *King* v. *Speke*, 3 Salk., 358 ; 1st Chitty Crim. Law, 700 ; Comyn's 'Digest "Indictment N." ; Batscomb's Case, 3 Modern R., 205 ; *King* v. *Garrick*, 2 Adolph. & El., 266 ; *Safford* v. *The People*, Parker's Crim. R., vol. 1, 474 ; Black. Com., vol. 4, 376 ; Barbour's Crim. Law, 330 ; 1 Archbold Cr. Plead., 180–1 ; 3 Am. Cr. Law, § 3197 ; *Dunn* v. *The Com.*, 6 Barr,

(Penn.), 381; *Hamilton* v. *The Com.*, 4 Harris (Penn.), 129.) That the exceptions to admission of evidence were well taken. (*Weeks* v. *Lowerre*, 8 B., 530; *Osgood* v. *Manhattan*, 3 Cow., 612; *Stanley* v. *Whitehead*, 12 Wend., 55; *People* v. *Hartung*, 17 How., Pr. R., 151.)

GROVER, J.  The case shows that the Supreme Court, upon motion of the district attorney, ordered the cause to be heard upon the reporter's minutes taken upon the trial of the prisoner, at the present term of the court, although such motion was opposed by the prisoner.  This order was not authorized by law.  Section 21, vol. 2, R. S., 736, gives to a defendant, on the trial of any indictment, the right to except to any decision of the court in the same cases and manner provided by law in civil cases, and provides that a bill thereof shall be settled, signed and sealed, and shall be filed with the clerk of the court and returned upon a writ of error, as theretofore authorized in personal actions.  The cause is to be heard upon the exceptions so settled, signed, sealed and returned upon the writs of error, and the law does not authorize the substitution of the reporter's minutes for these exceptions.  The latter are to be carefully settled by the trial court, and the performance of this duty by the court is equally important to the due administration of justice as any other with which the court is charged.  To substitute for the bill of exceptions, which the court is to see is made in exact conformity with the truth, the notes taken by a reporter upon trial, unrevised, perhaps, by him, and certainly not corrected by the court, would be hazardous both to the rights of the people and the accused.  Such a practice must be condemned.  It is a dangerous departure from the safe course furnished by statute.  The prisoner was compelled by the court to have his cause heard upon this paper, and the judgment of the Supreme Court has been based thereon.  It is manifest that the plaintiff in error might have come into this court and procured the reversal of the judgment of the Supreme Court affirming the judgment of the Oyer and Terminer, leaving

the latter judgment unreversed, but removed into the Supreme Court by the writ of error, and in that event it would have been the duty of the Supreme Court to rehear the case upon exceptions properly settled by the court, if any such were returned with the writ. But the plaintiff in error has not adopted this course. He insists that the minutes, having been substituted for the bill of exceptions by the Supreme Court against his consent, and the case heard thereon, he has the right to waive the legal error committed by the Supreme Court in substituting the minutes for a legal bill of exceptions, and to demand the judgment of this court upon the question whether regarding the minutes as a bill of exceptions, that court did not err in affirming the judgment of the Oyer and Terminer. His counsel argues that the Supreme Court had jurisdiction to hear and determine the cause when brought before it by writ of error; that this included the power of determining upon what papers it should be heard; that an error in this respect did not deprive the court of jurisdiction, but was a mere legal error which the party against whom it was committed was at liberty to waive, and which, after waiver by such party, is to be disregarded. Without passing upon this question, we have concluded that in this case, being capital, we would examine the minutes and the questions presented therein in a manner somewhat more liberal than upon a bill of exceptions settled pursuant to the statute, so far as the exceptions taken to the rulings of the court are concerned. Upon the trial, the counsel for the people proved by a witness that he heard cries at the house where the prisoner and his wife (the deceased) lived on the Saturday night preceding her death. The counsel for the people then asked the witness what those cries indicated, whether the person was crying for joy or what. The prisoner's counsel objected to this question. The objection was overruled, and an exception taken. This question clearly called for the conjecture of the witness as to the cause of the cries and not for a description of them. The former was incompetent. The latter was not. To this the witness

answered that it seemed to him she cried for help ; that he did not think she did it for pleasure. It was for the witness to describe the cries, so as to give the jury as correct an idea of them as possible, and then for the latter to draw such inferences therefrom as in their judgment were warranted.

The counsel for the people introduced Mrs. Laird as a witness, and proved by her that the prisoner and his wife came to her house on the Sunday preceding her death ; that the witness examined the head of the deceased in the absence of the prisoner and found a lump thereon, and that the right shoulder was black; that the deceased kept threatening all day to get him arrested. There was an objection taken to this evidence, but from the papers it is a little obscure whether it applied to the whole or to what part of it. What the witness discovered upon examining the head and shoulder of the deceased was competent evidence. What she said in his absence, whether by way of threat or otherwise, was incompetent. Its effect was injurious to the prisoner by creating a belief in the jury that he had inflicted violence upon her, causing the injuries discovered by the witness.

The record fails to show that the prisoner was asked by the court, after the verdict was rendered and before judgment was pronounced thereon, what he had to say why judgment should not be pronounced against him, or that any opportunity was given to him by the court, at this stage of the proceedings, for that purpose. This omission was error. It deprived the defendant of a substantial legal right. It was his right, at this stage, to move in arrest of judgment for any legal defect in the indictment or other proceedings, to show that the verdict was vitiated and should be set aside for the misconduct of the jury or for any other legal reason, or to plead a pardon. This has been the settled legal rule from the earliest history of the common law. This appears from the case of *The King* v. *Geary* (2 Salkeld, 630). Geary was attainted of high treason on an indictment, to which he pleaded guilty. Upon error brought to reverse this attainder, the exception taken was that it did not appear that he was asked what he had to say

why judgment should not be given against him, and the report of the case shows that the precedents were searched and all found to show this fact, and the court held the exception good, for he might have matter to move in arrest of judgment, etc., and the attainder was reversed. This case arose in the reign of William and Mary, and the report shows that the law had for a long period been that it was a substantial legal right of the prisoner to show cause, if any he had, why judgment should not be given against him upon a verdict or confession of an indictment, and that the record must show affirmatively that the court had given him an opportunity to exercise it. The like judgment for the same reason was given by the King's Bench in *The King* v. *Speke* (3 Salkeld, 358). The same judgment for the like reason was given in a case reported Anonymous 3d Modern, 265. In 1st Chitty Criminal Law, 700, it is said that "it is now indispensably necessary, even in clergyable felonies, that the defendant should be asked by the clerk, if he has anything to say why judgment of death should not be pronounced on him, and it is material that this appear upon the record to have been done, and its omission after judgment in high treason will be a sufficient ground for the reversal of the attainder. The necessity of the record showing that this right was given to the prisoner by the court is laid down as applicable to all cases, and no reason whatever can be given why its omission in the record should be any more fatal in cases of high treason than in other capital cases. The only reason why the omission is said to be fatal in the former, while silent as to the consequence in the latter, is that the question had repeatedly been raised and determined in the former; but it does not appear to have arisen in the latter. It is obvious that the same reasons for the rule apply alike to all capital cases, and when these are the same, the rule must be the same. The same doctrine will be found in Comyn's Digest, vol. 4, indictment N; 4th Blackstone, 376; Barbour's Crim. Law, 330; Archibald's Crim. Practice and Pleading, vol. 1, 180, 181. The question has rarely arisen in this country, for the reason, probably,

that the law was so fully settled and thoroughly understood that it has been almost universally observed in practice. See *Safford* v. *The People* (1st Parker's Crim. Cases), where the question arose and was somewhat elaborately discussed by HAND, J. These and other authorities that might be cited conclusively show that it is indispensable that the record should show in capital cases that the prisoner was required to show cause, if any, why judgment should not be awarded against him; that it is the duty of the court to hear and determine the sufficiency of such cause as much as to pass upon any other question during the trial. Indeed this may be regarded as a part of the trial, as it is an essential prerequisite to an adjudication of the guilt of the prisoner. The court has no more power to dispense with this rule or disregard it than it has any other legal rule, which the wisdom and experience of ages has found necessary for the protection of the innocent. It may be that the prisoner has sustained no injury from the non-observance of the law in the present case. But that is not the question for this court. That question is whether the record shows that the prisoner has been convicted of murder in the first degree in the mode prescribed by law. If it does, the judgment should be affirmed and execution done as the law requires. But if the record fails to show that he has been so convicted or that all the opportunities of showing his innocence given him by law have been given to him by the court, the judgment must be reversed and a new trial had. It is argued by the counsel for the people that the objection is obviated by chap. 226, Laws of 1863. That chapter contains but a single section amending section 24, article 2d, title 6, chap. 2, part 4, of the Revised Statutes, by adding the following words: Provided, however, that the appellate court shall have power, upon any writ of error, when it shall appear that the conviction has been legal and regular, to remit the record to the court in which such conviction was had, to pass such sentence thereon as the said appellate court shall direct. The object of this amendment was to provide for cases where it appeared that it was legal for

the court to give judgment; but that in the giving thereof error had intervened and a sentence passed different from that required by law. In such cases the amendment makes it the duty of the appellate court to reverse the judgment and remand the case with directions to pass such sentence as required by law. But that is clearly not this case. The court never gave the prisoner the opportunity of showing cause why the verdict should not be set aside or the judgment thereon arrested. It was not, therefore, legally proper to proceed to judgment. For aught that appears the prisoner may have a legal reason to show why judgment should not pass against him. Should this court remand the case prescribing the judgment to be rendered, the prisoner will be deprived forever of all opportunity of presenting such reason, if any, to the consideration of the court. The judgment must be reversed and a new trial ordered.

CHURCH, Ch. J., FOLGER, RAPALLO and ANDREWS, JJ., concurred.

ALLEN, J., read an opinion for reversal of judgment on the ground of failure to ask the prisoner if he had anything to say why sentence should not be pronounced, and remitting proceedings to Court of Oyer and Terminer to give judgment on the conviction.

PECKHAM, J. (dissenting). I am compelled to dissent. If there were no bill of exceptions before the Supreme Court, that court committed no legal error in looking at a paper they called a bill, as they found no error in it. It was a perfectly harmless thing; just as harmless as if they had looked for error on the lawn adjoining the court-house, and found none. It was no part of the duty of that court to make or settle a bill of exceptions. It was the exclusive duty of the prisoner's counsel to prepare the bill, if he had any faith in the case, and of the Court of Oyer and Terminer (not of the Supreme Court) to settle it, when presented for that purpose. The case does not show that such a bill was ever prepared or presented.

It was the clear right of the Supreme Court, at the instance of either party, to order to argument any cause pending there for that purpose.

If they gave the prisoner the benefit of a literal, *verbatim* report of the trial, contained in a copy of the reporter's notes, called it a bill of exceptions, and examined it, as if it were a legal bill, to see if the prisoner had sustained any legal prejudice, surely the prisoner cannot complain. He had made no bill of exceptions, as it was his duty to do, if he desired it, before the case was brought into the Supreme Court. If the reporter's notes had been struck out, he was left there with the simple record of conviction.

Nor can the prisoner come here and insist that this court shall look at this claimed bill of exceptions, with more liberality, because his counsel omitted to prepare it or have it settled.

If there be no bill of exceptions here, it is clear that this court has no legal authority, no jurisdiction, to reverse this judgment upon a pretence that there is a bill here. We cannot make one. We have as little right (if we call it a bill at all) to interpret it otherwise than we do any other bill of exceptions. We cannot legally usurp executive functions, and set aside the judgment upon statements not in the bill, either from sympathy or "liberality" of construction.

There was no error in allowing the witness to answer whether the cry he heard of "Oh, Joe!" for some little time, was a cry of joy or distress; whether it indicated joy or agony.

The witness answered, "he did not think she did it for pleasure."

The difference is easily perceived, but almost impossible to describe. To exclude such testimony would exclude evidence of a "groan," and compel a witness to describe the noise.

This was on Saturday night, as she was killed on Monday morning following.

But if there was error in allowing this question, this court would commit a greater error, if it reversed the judgment for that cause.

It is well-settled law, that "a verdict will not be set aside on bill of exceptions, though there was error on the trial, if the error was such that it could do no legal injury." (*Shorter* v. *The People*, 2 Comst., 193; *The People* v. *Gonzales*, 35 N. Y., 49.) The above were both capital cases.

The first related to an error in the charge of the judge; the second to the admission of improper evidence; and it was held that, when the fact which that evidence tended to prove was independently established by undisputed and competent evidence, and thus no injury could have resulted to the prisoner, this court had no authority to reverse the judgment on that ground.

The tendency of this evidence, as claimed by the prisoner's counsel, was to prove that the prisoner was maltreating or beating his wife on that Saturday night.

Yet it is independently proved, by two witnesses, that, on Sunday, the next day, she charged him with beating her on Saturday night, and breaking a stool over her head. He admitted the beating, but insisted that the stool did not break, but that the legs came out; but he said, "I broke her comb." Other maltreatment at the same time was proved in the same manner.

There is no other objection in the bill of exceptions of sufficient moment to allude to.

Mention was made of a witness describing a bunch on the head of deceased, as if to allow the inference that the prisoner had made it. This was not left to inference. The witness testified that she said he did it, in his presence, and the prisoner did not deny it.

It is urged that the record is fatally defective, in omitting to state that the prisoner was asked, if he had anything to say why sentence should not be pronounced upon him.

This ceremony was required in England at a time when prisoners were not allowed counsel. Hence this inquiry; so that, if the prisoner had received a pardon, he might plead it, or he might move in arrest of judgment. These are the reasons assigned for the rule. No case has been found in Eng-

land where the omission to make the inquiry had been held ground for reversing the judgment, except in cases of treason. The rule is now generally laid down in elementary writers, that, in treason (not in other felonies), the conviction will be reversed for its omission. The reversal is confined to cases of treason.

In this State, there was never the slightest reason for the rule. Prisoners have always had counsel here; and this inquiry was never necessary to enable them to plead a pardon or move in arrest. Here the prisoner is allowed a bill of exceptions to review decisions at the trial, as in civil cases. His rights are abundantly and carefully secured. No bill of exceptions is allowed in England; no new trial is authorized there.

We all know that this inquiry, so far as any legal effect is concerned, is here utterly idle. Not a case in our books shows that the rule was ever adopted here. The prisoner here, I may say, never makes the motion in arrest — never pleads a pardon. It is done by his counsel, and he does not wait to be inquired of, before moving. He moves, or pleads, in season or out of season. If the prisoner have capacity to defend himself, and prefer to do so, he takes the like course.

If this judgment be set aside, therefore, upon this ground, it is for the purpose of allowing this prisoner, in person, not by counsel, to make a motion, or put in a plea, which, every lawyer knows, he never will do. If he had any cause for either, his counsel would have done it. Yet, for the omission of this idle ceremony, this judgment is to be set aside, and the whole merits again tried. For this idle ceremony, the rule of England is to be extended further than any case has carried it there; further than any elementary writers extend it. Besides, if he had any ground whatever for motion in arrest, it would appear in this record, on this writ of error, and he could reverse the judgment on that ground now; as, whatever is ground for arrest is now ground for error. (1 Chitty's Cr. Law, 5th Am. ed., pp. 751, 752.) But it affirmatively appears, on inspecting the record, that he has no such

ground; in fact, none is pretended. Again, if he had a pardon in this State, he could avail himself of it, even up to the gallows.

But, assume this inquiry to be necessary, then the statute of 1863 makes a new trial unnecessary. It provides that, where "the conviction has been *legal and regular*, the appellate court shall have power to remit the record to the court in which such conviction was had, to pass such sentence thereon as the appellate court shall direct." (Laws of 1863, p. 406.) "Conviction," in this statute, means "when the jury find him guilty. He is then said to be convicted of the crime whereof he stands indicted." (4 Bl. Com., 362; 1 Bouv. Law Dict., 282.) But this is not denied. In fact, "conviction" is so used generally in statutes, as to punishments.

When the "conviction," then, has been "legal and regular," and some illegality or irregularity afterward intervened, it may be corrected by a regular and proper sentence, without the absurdity of a long trial on the merits again, in order to pronounce the sentence properly.

It is said that, if a wrong sentence had been passed, we might direct a right one. But, if the right sentence had been irregularly passed, the statute gives us no authority. That qualification may be found in the court. It is not in the statute. Its only qualification is, if the "conviction has been legal and regular," then we may remit, and direct the court to do — what? to "pass such sentence as the appellate court shall direct." The act provides a remedy for an irregular sentence, as plainly and in terms, as it does for an erroneous sentence, and with precisely the same reason. The object of the statute seems very plain. It is to correct any irregularity or illegality occurring after the conviction, when the merits have been fully tried. It is to correct the point where there had been illegality, without touching the merits, when there had been none, as to their trial. When people were hung for petit larceny, courts might well speak *in favorem vitæ*. But now, when punishments are proportioned to offences, I see no

reason for seeking to shield the highest criminals, while the petty offenders are punished with rigor.

Where human life is in issue, greater care and caution should be exercised, to get at the truth, to arrive at a right result. When that is found, no more favor should be shown to the willful murderer than to the petty thief. But the penalty due to each should be declared with the same impartial justice.

I have been able to find no error in the trial of this prisoner, or in the record thereof. The judgment should be affirmed.

Judgment reversed, and new trial ordered.